Georgeisation Council Council, may I please the Court? The Court should reverse the Board's final written decision in this case for two independent reasons. The first reason is that by adopting an obviousness argument that was never presented by Berler during the IPR proceedings, the Board exceeded its statutory authority and denied Ravoma its due process rights. The second ground is that the Board's new obviousness argument that it adopted in its final written decision is not supported by substantial evidence. Let me just focus on what is in my mind. Suppose it were the case that in your patent owner response you submitted a bunch of evidence and contentions that on their face were indisputable admissions that under your claim construction, not their claim construction, every element was shown or rendered obvious by the prior art. I'd fail to see in that circumstance how there's a due process or other problem. Take including a statutory problem. It happens all of the time that litigants lose their cases based on their own admissions. So it seems to me that your argument for a procedural irregularity of consequence or even the lack of substantial evidence depends on your showing that you're explaining to us that what you said in your patent owner's response left a gap between what you said and the inferences that the Board made to find obviousness. And for that, the other side needed evidence and they didn't, I think they agreed, they did not put on any evidence. So it depends on that gap between what you said in your patent owner's response and the findings that the Board needed to make, a gap that needed to be bridged by evidence. Can you explain what there was that the Board was inferring from your evidence as opposed to just reading it plain on its face to say these various internal structural process conditions, you just conceded they were all met. Sure, I'm not sure if I agree with the position that, well I guess it depends on the factual circumstances. But in the situation where the petition, like in this case, is set up so that it's solely based on a claim construction where there was no evidence submitted in support of the petition. Instead they replaced three of the four claim elements, three of the four process steps with compositional limitations. And simply mapped through attorney argument, not supported by an expert declaration, the compositional limitations that it's reading into the claim to the prior art. In that situation, the fact, in justifying that argument with a lack of enablement. And when evidence of enablement, that is when you're armed with the teachings in the specification of the patent. One skill in the art would be able to manipulate the final microstructure of the steel. In that situation, no, there has not been a concession. And the patent office cannot pick through the evidence that was submitted for enablement in order to cobble together a new obvious disposition, basically reexamine the patent claim. So I'm not sure I agree with the premise of your question, but I will address the substance of the question. And that is, your question I think I understand it is, what did the board have to bridge from what we said in rebutting their claim construction position to where the board had to end up in order to find these claims obvious? And that relates primarily to our second ground. It's similar to our second ground in that we say that the board's new obviousness argument lacks substantial evidence in the record. So here, the board relies on the five prior art references that were in the petition for the unremarkable proposition that steels in the prior art met the 2-10% molybdenum plus tungsten plus vanadium requirement in carbitic constituents. That's fairly unremarkable. From there, the board made the leap to one skill in the art would have been motivated to adjust not only the matrix structure, so the board relies on the biotic reference, to show that one skill in the art, some researchers were looking at the fact that the matrix structure, that is, remember the 056 patent talks about manipulating not only the thermal conductivity and the defectivity of the matrix, but also remove carbon from the matrix for that purpose into certain types of carbonic constituents with high thermal conductivity. In particular, large coarse carbides, the molybdenum 3C or the tungsten 6C type carbides. If you do that and add those two things together and that's your goal, you're able to achieve these high thermal conductivities. So what the board did is it took biotic, which just deals with matrix structure. So that's the crystal structure of the steel crystal structure, not the carbides that have been precipitated out of the matrix. So that's all that biotic talks about. There's seven different microstructures shown in biotic. Each one of those are different phases, pearlite, ferrite, and that sort of thing. No recognition or appreciation of the role that the precipitated carbides will play in achieving the thermal conductivity. So biotic, if you look at the actual thermal conductivity measurements in biotic, they range from just over 26 to under 34, which falls well within the range of the prior art thermal conductivities described in the 056 patent. So biotic certainly represents the notion that researchers knew that the microstructure changes would impact thermal properties, but there was no appreciation and there's no reference in the record that teaches that one had the appreciation that Mr. Valls-Engels, our inventor, had of targeting not only the matrix defectivity and getting chromium and carbon out of there in order to achieve that purpose, but to precipitate these specific types of carbides. And that together, you were able to achieve before unknown levels of thermal conductivity. So the biotic reference... I understand what you're saying is development that your inventor added. Where would I find that in a claim? Would that then be in step three and maybe with the result you get in step four? Well, the step two is informed by step three and four. So step two of the process is metallurgically creating an internal structure of the steel in a defined manner. And the defined manner is you're targeting these types of carbides, these types of internal microstructures that have a surface... Now I'm looking at claim one. That have in step three a surface fraction and a thermal conductivity of the carbidic constituents and a surface fraction of the matrix material. So you look at both sides of the equation, the precipitated carbides and the matrix. And together, that has to be of the microstructure that would reach 42 watts per meter kelvin. So there's no specific... And I was asked... What do you think the board relied on to get the carbidic constituents in its analysis? The board took a leap from one skill in the art would want high thermal conductivity. I don't think that was necessarily shown in any of the references. I explained to the judges on the board that there's different reasons why you would want to manipulate thermal conductivity. Sometimes you have a press where you want it to have low thermal conductivity so that the heat dissipates more slowly. And that the piece that you're creating will not cool so quickly for purposes of that particular process. So they took the leap from you'd want to have high thermal conductivity. They inferred from Biotti that one would appreciate that carbides somehow affect that thermal conductivity when that's not in Biotti. And then they said you would optimize. And they rely on a 2004 Berler patent, which was exhibit 2011 below. And during the questioning, they say there was one skill in the art would want to optimize the microstructures. But in that reference, that was a cold work steel. The optimization of the carbides. Could you tell me where it is that you're referring to? Do you mind giving me an A site? I'm looking at pages A20 through 22 seems to be where the board's analysis is. But could you help me to tell me exactly within that where you're referring to right now? Sure. The boards, yeah, 20 through 22 is where they applied it. And they relied on some of the art in the earlier section relating to the claim construction. But in the trial transcript, the line of questioning related to the optimization of the microstructures, and that pulled from exhibit 2011, which was the Berler patent that's found in appendix 1422. 1422? That's the Berler patent. So the Berler patent that they relied on, if you look at 1428, column 4, lines 6 through 18, this was what the board, during the line of questioning, during the oral argument, leaped from. Is that one skill in the art would optimize the microstructure, but there the changing of the carbides and the carbide type were related solely to toughness and wear resistance for cold work material. It had nothing to do whatsoever with thermal conductivity. So the board pieced together the fact that one skill in the art would have this vague notion that the matrix would affect the thermal conductivity. The notion, based on the board's independent reading of this 2004 Berler patent, that one would optimize the microstructure, pieced that together and leapt to the place where they say one skill in the art would be able to appreciate that the combination of the matrix, the combination of the carbides, in particular reaching the specific carbides that are pulled out or called out in the 056 patent would have enabled one to even get to there. When, as explained in the specification, the prior art at the time thought that thermal conductivity of hot work steel was driven, was more of an internal or an intrinsic characteristic of the steel. And there were some papers like Bayati that said, well, there's some differences. But what the 056 paper or patent did was it enabled those skill in the art to understand that if you focus on the type of carbide you're using to suck the carbon out of the matrix to improve that defectivity and get high thermal conductivity carbides, you're able to reach these high levels of thermal conductivity that were never seen before. I would like to save my three minutes, and I'm almost up on that time, and touch briefly on the fact that... I also want to note the fact that the revolver below taught the fact that the primary reference, the 813 patent, the EP813 patent that the board relied on, it taught against, specifically repeatedly over and over, taught against precipitating these coarse carbides that the 056 patent teaches are key to reach the promised land of the high thermal conductivity because that patent was concerned with creep rupture strength. And it said these coarse carbides will reduce that feature, and that patent was all about increasing creep rupture strength. So the idea that you're leaping from a primary reference for the composition to what's claimed in Claim 1, 2, 3, or 4 of the 056 patent, based on this reference, we think contradicts the expressed teachings of the reference, and neither Berler nor the board ever reconciled these teachings of the reference, and instead found the claims obvious. I'll reserve the rest of my time. Good morning, Your Honors. I'm Max Peterson. I represent Bohler, Ederstall, GMBH & Company, the appellee in this case. Your Honor, this case follows a reasonably well-developed line of precedent involving analogous fact scenarios. A party introduces post-petition evidence to help define the level of ordinary skill in the art. The board considers the evidence in its obviousness analysis, but only to define the background knowledge against which the prior art cited in the petition must be read. The patent owner then appeals the final decision because the evidence was not part of the initial petition. The court has fairly uniformly held that the board must consider the post-petition evidence of the level of ordinary skill. What I at least don't remember seeing before is a situation where the petitioner argues the claims are invalid if construed to mean X. The board ultimately says, we're not going to construe them to mean X. We're going to construe them to mean Y. And the petitioner has never argued that if construed to mean Y, the inventions claimed in this now Y-construed claim would have been obvious. Never even argued it. And you don't hear either, right? Your red brief is all about the claim construction. You never say, if the claim construction is perfectly right, here's why still would have been obvious. We did believe strongly that our claim construction was correct. That is correct. And, in fact, we felt it unusual that a patent owner would come in with this large number of references to justify enablement because clearly when you say that the claim limitations are enabled by the prior art, you're saying that the claim limitations are known in the prior art. But we thought that they really had to dig to find this prior art. Very little of it was cited in the prosecution history. It was something that they really had to dig to find. And then to make this argument that in order to enable this broader claim construction, we're relying on all this prior art as common knowledge, which to us seems like superior knowledge, but the board accepted it as an admission of common knowledge. I mean, in a way, we thought it was a blessing that they made these admissions, but we never really, at the time, we honestly didn't believe that the board would go that far outside of the specification to find enablement in that broad of a scope. And that was why we did not argue that if the claims were construed in this fashion, based on all these admissions, of course, then you're just down to three limitations are taken out by the admissions regarding the prior art. And all that's left are the one or two that relate to composition, and then the end result, which is thermal conductivity. Clearly, what was in the specification, 31 out of 31 examples produced that high thermal conductivity, regardless of the processing conditions. There was very little discussed in the processing conditions. Right, but just taking, there are a number of things about this case that seem at least out of the ordinary, the way the claim is written. It seems a little bit out of the ordinary, but we're just focused here on the process that got us here. And the process was you argued the claims basically are just the composition, and more or less ignore these sort of middle pieces about what you are manipulating to get there. The board said, well, provisional, we'll institute kind of on that basis, but the question is open. Then the board says, no, we actually now agree with the patent owner that those middle elements of the claim having to do with what you are manipulating to get to the composition and the properties are actually important. And then said, even though you haven't presented any evidence on the prior art teaching those things, they did. And that's enough. That's what we have to deal with. And the question is, did the board go beyond either what it was permitted to do procedurally or was permitted to do on the evidence in front of it? We believe that the board did what it had to do. Well, there are a couple of reasons. First of all, this case is different in that all the cases where we've found where this issue has come up, it's the petitioner that comes in and introduces evidence beyond the initial petition, either in a reply brief or at some point along the way. And then the patent owner cries, this is unfair. We didn't have a fair opportunity to address that. Right, it's hard to see how they can be surprised by what they themselves submitted. So this case is different in that the patent owner comes in with all this evidence. We looked at it and we said, well, if the board accepts this, it's really kind of harmless. They're really taking out three of their claim limitations. Why should we argue against this? Really, why should we? But we didn't think they would. We didn't emphasize it. We didn't focus on it. Now, the second part of your question is that the board did absolutely what it had to do. This goes all the way back to Graham versus John Deere, where the court in Graham versus John Deere held that under Section 103, the scope and content of the prior art are determined. Differences between the prior art and the claims are ascertained. Where did it determine the differences between the claims and the prior art? I'm sorry? Where did the board determine the differences between the claims and the prior art in its decision? In reading against what they called the background prior art, and that's the part of Graham versus John Deere which I was going to say, against this background is where the obviousness, against the background of the level of early skill in the art is where the obviousness or non-obviousness of the claims is determined. So the background prior art was really, showed those three claim limitations which were admitted in the patent owner's brief to be known in the prior art. These were the selecting steps and really everything except for the compositional step and the ultimate thermal conductivity, what they found to be admitted as background prior art. Now, the compositions is what was left. Those were anticipated up and down by each and every one of our references that we cited, each and every secondary reference. I'm having a hard time. I'm struggling a little bit with the substantial evidence issue. And I think what it is is that I can see where the first element of the claim is met by the prior art references, but I don't see where the board has lined up what the prior art teaches with respect to elements two, three, and four. So it might be helpful if you walk through that a little bit. The prior art itself did not disclose elements two, three, and four in a literal sense. The prior art disclosed the compositions which were pointed out in the specification as being very narrow compositions, which really almost 100% of the time would meet this thermal conductivity limitation. The specification itself without going outside, without looking at the prior art was only enabling as to the compositions, and that's what the board found in its initial institution decision was that we're going to construe the claims in this narrow fashion according to the specifications. I understand that. Those compositions were all in the prior art, and it was really reading through the limitations themselves. They're couched in terms of selecting compositions which have this internal structure, selecting a surface fraction of thermal conductivity of matrix material. But then the specification gives very precise compositions which meet those limitations 31 out of 31 times, and those were all in our prior art, and that's what we relied on to show those steps. I understand that's what you did in your petition. I'm asking you to help me understand the board's decision at pages A20 through 22 where they say even under this more narrow claim construction, we're going to say that the prior art in view of what was, I guess, known and what was presented by the patent owner renders this claim obvious. And what I can't figure out is how to map that prior art and this knowledge that they discussed on pages 20 through 22 to each of the claim limitations in the claim. Well, what they're saying is that the compositions which are in the specification, which are known in the prior art, and it was recognized throughout the hearing that they have a very high probability of meeting this thermal conductivity limitation. And somewhere in there they had said that applying this against the background where it's known to manipulate thermal conductivity by manipulating the matrix structure, by manipulating the impurities. And some of the other language that they used. Okay. PTA found that heat transport and thermal conductivity were known to depend on lattice defects, microstructure, impurities, processing, and matrix structure, which were the subjects of several claim limitations. You start with a composition which really 31 out of 31 times gives a high thermal conductivity according to the specification. And then there's a teaching that you can manipulate the thermal conductivity. You're relying on the specification to get to the 42? What do you rely on? What is the prior art that teaches that you'd want to have a thermal conductivity of 42? Prior art doesn't teach that number. The prior art, the primary reference, which they've contested, directionally taught that if you minimize the low chromium content, you'll get a high thermal conductivity. And they taught the desirability of high thermal conductivities. The secondary references, a couple of them, we had suggestions of higher thermal conductivity based on low chromium content and minimizing the chromium content, based on the compositions that were given. But in each and every case, it was always achieved through composition in terms of the prior art. They did not go into the specific claim limitations of selecting surface fraction and thermal conductivity. Are you saying that these limitations are inherent in the prior art? That's what the board found, and to some extent they are. What did the board say inherent? I guess it said page 22, the skilled artisan would have at least inherently completed the selecting steps? Yes, yes. I'm looking for the quote right now. The quote 22. Right above accordingly. Yeah. I don't see a cite there. That's not really the usual use of inherently. I'm not sure what the skilled artisan would have inherently, unless it means always would have. And I think you several times used phrases like to a large extent inherent. That's usually not enough for inherent if it was ordinary. Strictly based on the specification, it was inherent. But at the hearing, it came out that there was some evidence outside of the specification. There was one example, which had those compositions, which did not produce a high thermal conductivity. So really the better approach is to say that there's a very high probability, a very high likelihood that if you have this composition, you will meet this thermal conductivity limitation based on the record. And it would have been obvious, therefore, to manipulate the microstructure and manipulate the impurities, which were background prior art in order to achieve these microstructures. It doesn't require apparently a very large, when there's high probability of doing something, it doesn't require a lot of manipulation to get there. And it might not require anything at all. And it would have been obvious to manipulate the thermal conductivity using these microstructures and lattice defects and the various other things, which were. What about manipulating the carbidic constituents? Is that taught in the prior art? And I guess I'm not sure I understood entirely everything that's going on here, but I thought that that argument was right at the center of what Mr. Twigg was concentrating on. That argument, to some extent, we believe goes beyond the scope of the claims. The claims don't talk about large carbides in any degree. However, the claims do talk about two to 10% by weight, molybdenum plus tungsten plus vanadium. And those are carbidic producing elements. So what do you understand to mean the surface fraction or the volume fraction, either way of the carbidic constituents? Isn't that, doesn't that, that makes me think of the word large, which you said this doesn't talk about. Well, surface fraction and volume fraction, the way the claims are written it can go anywhere from zero to one as long as you get that thermal conductivity. There's really nothing in the specification that says you have to have a certain surface fraction and a certain volume fraction to achieve this result. It just says selecting a surface fraction and a thermal conductivity and selecting a volume fraction and thermal conductivity so that you get this result. When you start out with a composition which has carbid producing elements anyway, which is known in the prior art, carbidic constituents and two to 10% MO plus W plus B, and then you use these prior art techniques, some of them, which really are, it involved a thermal calc software, it involved computer modeling, it involved really a lot of technology, which wasn't in the specification, but which was admitted to be known. That's how you perform the steps A and the B. And the argument that we had made was that the only way, the only way you can perform A and B is by choosing these compositions because there's nothing else. The argument that Ravalmi had made was no, you don't have to choose compositions. You can get there by all these techniques which are known in the art, which aren't described in the specification. Buying into that, it tells you that these steps are, in fact, known in the prior art. We didn't think the board would go that far to accept that for purpose of enablement because it's way outside. Did they admit below that removing carbon or selecting the amount of carbidic constituents was known in the prior art? Because I thought that's what they were saying was their contribution. Well, selecting the carbidic constituents is part of the composition. When you have the composition, as I said, carbidic constituents and two to 10% molybdenum plus tungsten plus vanadium, those are large carbide-producing elements. I understand, but I think what I understood the claims, at least this part to be going to, is the idea that you do have something that has the composition that meets the limitation in Claim 1. And then you do some sort of manipulation in Steps 2 and 3 to achieve the thermal conductivity in Step 4. And so I'm just asking you, yeah, it might be inherent that in any particular hot work steel you're going to have some carbidic constituents, but, I mean, you're selecting them in order to achieve something, right? Yes. So are you saying that they're admitting, they admitted that in the prior art it taught selecting certain carbidic constituents in order to achieve a particular thermal conductivity? The prior art did not, as I recall, the prior art did not specifically teach that. What the board found was that the prior art teaches the composition which achieves that, provided you provide the known manipulation, which is known in the prior art. The board did not rely on the background of the art as teaching the specific compositions. The compositions were taught in the prior art that we cited. What the board relied on was that you could manipulate the microstructure, you could manipulate the size of the carbidic constituents using these well-known techniques which had been admitted to by Rovalma, and that's what allowed them to arrive at the broader claim construction, which wasn't limited to, narrowly, to the composition. And we went through it in our brief. The board did not do its own independent assessment of the prior art. We looked at everything they said, and everything they said, and it's shown in our brief, it's outlined, relied paragraph by paragraph on what Rovalma had said, either in their brief or at the hearing. The board did not make up its own assessment of what was in that prior art. They went almost sentence by sentence and picked out things that Rovalma had said and relied on those in their final decision. It was strictly a case which was based, I mean, larger than any other case I've ever seen, based on admissions by the patent owner that the patent owner had to make these admissions in order to achieve a broad scope of enablement, but by making these admissions, they kind of played a dangerous game. If they're known in the prior art, they're known in the prior art. Okay. You have one more sentence. I have two and a half minutes, I believe. Clock's running up. Don't I have two and a half minutes? No, no. You're over. Your time is over. You're two and a half minutes over. Oh, I'm sorry. It's going the other way. Okay. Well, anyway, I guess what I wanted to say was that one more sentence. Rovalma either knew or should have known that the board would consider its evidence and admissions and an ample opportunity to address it, because under Graham v. John Deere, they're required to consider that prior art once it's in the record of the level of ordinary skill. So the board followed well-established law in considering the level of skill in the art, and its decision should be upheld. Thank you. If I was an English teacher, I'd … I have several things I want to address quickly if I have time. The first is that we made no such admission that the steps two, three, and four were in the prior art. There's a fundamental difference between admitting that once you're armed with the specification of a patent, you're able to achieve those things using tools available in the art, and the place that the patent office ended up was that it would have been obvious to do so. That was nowhere in any of the discussion below. The second thing is … The enablement issue came up in debating what the right construction was? Correct. The first paragraph of the petition says they enabled no other way other than composition. And, therefore, should be construed that way, and you said, yes, they do, so they should be construed a different way. Correct. Okay. And the other thing I wanted to address is that Your Honor said that we shouldn't be surprised that the Board is referencing these things. Certainly we were not surprised that the Board referenced the evidence that we put into the record, but we were surprised where the Board extrapolated to from the references we had. And maybe it isn't a surprise given that at the time of the Board's final written decision, the PTO's official position that was that it was free to make any argument of patentability that could have been raised in a properly drafted petition, but wasn't. And that was what the PTO's counsel told the Court in the Magnum Oil Tools case. And we put that in the record. And, as you know, the Court has since rejected that position and said that, and I'll read the quote, it says that while the PTO has broad authority to establish procedures for revisiting earlier granted patents and IPRs, that authority is not so broad that it allows the PTO to raise, address, and decide on patentability theories never presented by the petitioner and not supported by the record evidence. So we feel that this is part of the growing pains of the IPR process, is that the Board had a broad view of what it was permitted to do and it thought it could examine independently. If we agreed with you, should we remand or reverse? You should reverse because the only ground presented in the petition. But if they were just proceeding under an incorrect assumption about what they could and couldn't do, why don't they get a chance now to do it right? Because all they can do is address the grounds that were raised in the petition, as we demonstrated, and which is undisputed actually on appeal here, is that that was improper. It was based on improper claim construction. And that exercise of mapping from a compositional limitation that you pull from the spec to the prior art fails based on claim construction and there's nothing left. Thank you, Counsel. Thank you. The matter will stand submitted. All rise.